Judge Mills
delivered the opinion of the court.
Andrew Lewis, owning a military survey containing, by the patent calls, 2000 acres, but in fact more, died, having previously made his last will and testament, in which he devised to his son John 1000 acres, part of the 2000, its position to be fixed by the choice of John, and the residue (supposed to be 1000 acres) to be equally divided between his sons Thomas, Andrew and William. Of this tract there does not appear any division to have taken place, determining the choice of John, until after the remaining devisees took possession and sold to Singleton, the ancestor of the present appellees, a proportion of the tract, and he took possession and for a long time held the uninterrupted enjoyment, until the appellants, heirs or representatives of John, the devisee, filed their bill, claiming their choice in a division and the whole or a proportionate share of the surplus. A partition was directed, and a proportionate share of the surplus assigned to each devisee by the decree of the court below, which decree has been affirmed by this court. In making this division and extending the devise of John, a considerable portion, not only of the land, but of the improvements made by Singleton, under his purchase from one of the remaining devisees, was allotted to the complainants. The court below appointed commissioners to value the improvements, and the face of the order directed the commissioners to take as their guide in their assessment the act of assembly entitled “An act to amend an act entitled an act concerning occupying claimants of land.”
To this act the commissioners conformed in their report. It was excepted to in the court below; but the court in the decree thereon, pursued the directions of the act aforesaid. By the errors assigned, this question is presented—Is this case within the provisions of the act recited? The answer to this question involves the construction of the act, which can be correctly given, by considering the old law, the mischief and the remedy. In England and in Virginia, from which our jurisprudence is taken, the contests decided in lands, arose about the same title. All claimants in tracing back the chain ended in the same grant from the government, and the controversies existed between the *215 claims then existing, and the original grant. In this state a different kind of controversies arose. The defect existed in the formation, or rather previous to it. An occupant, who examined his title to its origin, and found every link in the chain valid and complete, would, in this state of things, be surprised to find the base itself destroyed by another claim derived from governmental authority. To decide the validity of claim and claim opposed to each other required the exercise of great legal skill and length of time. The skill of the most eminent counsel has been baffled by the result of decision. Courts themselves have oscillated, and have often been compelled to abandon the paths they had chosen, in this untried system of controversy, and the labor of years has produced a branch of the science of law different from the system of, and measurably unknown to, other governments. At the close of these controversies the question of compensation for improvements, and the charges for rents, profits and waste occurred. The ancient principles of equity, which suited the controversies of other governments, and which charged the unsuccessful occupant with rents, because, by reasonable scrutiny he could or might obtain a knowledge of the defect of his title, were supposed to bear hard upon him when applied to his case, the result of which could not have been predicted by the most profound and skilful counsellor. From this arose his claim to an exemption from rents, and this exemption the legislature intended to afford him by the act in question;—and this court cannot conceive that the legislature intended to subvert the principles of equity, long since adopted in controversies of another nature, the application of which principles, in the cases to which they had been long applied, had been found adequate to administer substantial justice. Consistent with this intention we conceive are the expressions of the act in question, “supposing them to be his own, by reason of a claim in law or equity, the foundation of such claim being of public record.”' If, in scrutinizing his title, either legal or equitable, he could arrive at the foundation, without defects, in some public record, or, in other words, some office where the appropriation was allowed by government to be made, he should then claim under the act the exemption from rents, till the decision of a court of competent jurisdiction should apprise him that the foundation itself was erazed; to such cases the statute peculiarly and exclusively applies.
An occupant driving claim under the same patent with the successful claimant, should not be charged with rents the successful claimant asserts his claimed suit should be liable for waste, and have credit for the intrinsic value of all lasting improvements Vide 1 Marsh 3, For's heirs vs. Loughly and the cases were cited.
Apply this construction of the act to the case of Singleton’s heirs, now before the court, and it is clear they cannot come within it. They and their adversaries trace their titles to the same public record, and the defect exists in subsequent alienations, and their confidence in supposing the land to be their own must have arisen from a trust in a supposed or real parol division, or in a misconception of the will of Andrew Lewis, the elder, and probably in both; and although they have lost, the base of the title remains as stable as it ever was. They cannot, therefore, be entitled to the application of the act.
It has been suggested in argument, that it does not appear what law the commissioners applied, in as much as they were allowed to report such matter as either party might require. It does not, however, appear that they imported any matter at the request of either party; of course they must have reported as instructed by the court below. The act of the court directs them to take the statute for their guide—they conform to the act in every substantial particular, and the orders of court subsequent shew that the court intended to, and did apply, the act to the case, while the appellants excepted to the legality of the proceeding.
The decree must therefore be reversed, and the cause remanded for new proceedings.
But the question presents itself to this court, what kind of instructions to commissioners, and decree, ought to have been rendered? The claim for rents often varies greatly by the rules of equity as to its commencement. Sometimes it ought to be allowed from the commencement of occupancy. At others it is curtailed according to the supposed security of the occupant, or the supineness of his adversary in asserting his claim. Varieties of this kind frequently occur, where the dispute arises on the same title, and without varying the rule according to the circumstances of the case injustice might be done. This, by the bye, strongly conduces to shew that the legislature did not intend to apply the statute, with its inflexible rules, to cases requiring the chancellor to vary with its circumstances. Singleton’s possession was long undisturbed. The construction of the will might, and no doubt was, considered a matter of some difficulty. Besides, in a decision it depended on a contingency whether any of his improvements be assigned to the remaining devisees. It seems to the court, that, under such circumstances, his heirs ought *217 not to be charged with rents and profits prior to the commencement of this suit. That they ought in like manner to be charged with all injuries arising from waste and reduction of soil during occupancy, and to be credited with all lasting and valuable improvements existing on the premises recovered, at their intrinsic value, and that on an account thus taken the decree ought to be reversed in favor of whichsoever party the balance may appear.
Wickliffe and Hardin for appellant, Haggin and Pope contra.